# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2014-KA-00869-COA

ERIC PELLETIER A/K/A ERIC BLAKE PELLETIER                    APPELLANT

v.

STATE OF MISSISSIPPI                                              APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 01/27/2014 |
| TRIAL JUDGE: | HON. JOHN HUEY EMFINGER |
| COURT FROM WHICH APPEALED: | RANKIN COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | JAMES F. NOBLE III |
| | ROSS R. BARNETT JR. |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: BARBARA WAKELAND BYRD |
| DISTRICT ATTORNEY: | MICHAEL GUEST |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| TRIAL COURT DISPOSITION: | CONVICTED OF POSSESSION OF A SCHEDULE II CONTROLLED SUBSTANCE AND POSSESSION OF A WEAPON BY A FELON AND SENTENCED AS A HABITUAL OFFENDER TO TWENTY-FOUR YEARS FOR POSSESSION OF A SCHEDULE II CONTROLLED SUBSTANCE AND TEN YEARS FOR POSSESSION OF A WEAPON BY A FELON, WITH THE SENTENCES TO RUN CONCURRENTLY, ALL IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AND TO PAY FINES OF $500,000 AND $5,000 |
| DISPOSITION: | AFFIRMED - 03/17/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

EN BANC.

WILSON, J., FOR THE COURT:

¶1. On March 28, 2013, Flowood Police Department Officer Kyle Himmell initiated a traffic stop of Eric Pelletier for an inoperable tag light. After Pelletier gave permission, Officer Himmell conducted a search of Pelletier's vehicle. During his search, Officer Himmell found a pill bottle containing twenty-four dosage units of lisdexamfetamine, also known as Vyvanse, a Schedule II controlled substance; metallic knuckles; and a switchblade knife. Officer Himmell determined that Pelletier was a convicted felon and placed him under arrest for possession of a Schedule II controlled substance and possession of a weapon by a felon.

¶2. A Rankin County grand jury returned a two-count indictment charging Pelletier with possession of more than twenty but less than forty dosage units of Vyvanse and possession of a weapon (the metallic knuckles) by a convicted felon. In January 2014, a Rankin County jury convicted Pelletier on both counts. After determining that Pelletier was a nonviolent habitual offender, the trial court sentenced him to twenty-four years for possession of a Schedule II controlled substance and ten years for possession of a weapon as a felon, all in the custody of the Mississippi Department of Corrections (MDOC), with the sentences to be served concurrently.

¶3. On appeal, Pelletier argues that his trial counsel was ineffective and that the trial court improperly excluded a witness as a sanction for a discovery violation. We affirm because Pelletier's ineffective assistance claim is not capable of adjudication on direct appeal and the trial judge did not abuse his discretion by excluding the witness.

**FACTS AND PROCEDURAL HISTORY**

2

¶4.     On March 28, 2013, Pelletier was traveling from Gonzales, Louisiana, to Starkville when he was stopped by Officer Himmell for an inoperable tag light. While some of the facts involved in the traffic stop are in dispute, there is no dispute that Pelletier gave Himmell permission to search his vehicle. During the search, Himmell discovered three prescription pill bottles labeled in Pelletier's name. However, one bottle's contents did not match its label. The bottle contained twenty-four dosage units of fifty milligram Vyvanse tablets, a Schedule II controlled substance, rather than the listed prescription of twenty milligram tablets of amphetamine salts, also known as Adderall.

¶5.     Himmell also discovered two weapons, a switchblade knife and metallic knuckles. The location of the metallic knuckles is in dispute. Himmell testified that they were in a shoe box on the back seat, while Pelletier claims that they were inside a tool bag. Himmell and Pelletier agree that the switchblade knife was in the tool bag.

¶6.     On August 15, 2013, Pelletier was indicted on one count of possession of more than twenty but less than forty dosage units of a Schedule II controlled substance and one count of felon in possession of a weapon in reference to the metallic knuckles. The State did not pursue charges related to the switchblade knife.

¶7.     Pelletier hired James Adam Powers as his attorney. On October 4, 2013, Pelletier acknowledged service of his indictment and pled not guilty. On the same day, the circuit court entered a scheduling order setting trial for January 21, 2014. Also on the same day, Pelletier, through Powers, requested discovery from the State pursuant to Uniform Rule of Circuit and County Court Practice 9.04. On December 9, 2013, the State provided Pelletier

with the discovery required by Rule 9.04 and formally requested reciprocal discovery.

¶8.     However, Pelletier produced no reciprocal discovery to the State. On January 6, 2014, the trial court held a pre-trial conference, which Pelletier attended.  During the conference, Powers acknowledged to the court that although the State had complied with Rule 9.04, Pelletier had not provided the State with reciprocal disclosures.  The court then inquired, "So do you not intend to call any witnesses or introduce any evidence outside of your client's possible testimony?"  Powers responded that he might call Pelletier's roommate.  The court ordered Pelletier to produce all reciprocal discovery, including the names of any witnesses that he might call at trial, by 5 p.m. on January 7.  Nonetheless, Pelletier provided the State with no names of witnesses or any other discovery.

¶9.     On January 7, 2014, the State moved to amend the indictment to charge Pelletier as a nonviolent habitual offender.[1]  Powers filed no response, and the court granted the State's motion to amend the indictment.

¶10.    The case proceeded to trial as scheduled on January 22, 2014.  Himmell testified that after he stopped Pelletier's car, he noticed that its tag was expired, and dispatch informed him that there was no record of the tag.  He then approached the car and asked Pelletier for his driver's license and proof of insurance, but Pelletier informed him that his license was suspended and he could not provide proof of insurance.  Himmell testified that Pelletier was extremely nervous and visibly trembling at this point.  Himmell then informed him that he

---

[1] In 2005, Pelletier pled guilty to separate charges in Webster County of stealing a four-wheeler (grand larceny) and stealing a red nose pit bull (larceny). The Webster County Circuit Court imposed sentences of five years in MDOC custody, with three years suspended, and two years in MDOC custody, with the sentences to run concurrently.

4

was going to write him a warning ticket for the expired tag. While Himmell and Pelletier were talking, Corporal Josh Fuller, also of the Flowood Police Department, arrived at the scene and parked behind Himmell's patrol car. Himmell testified that Pelletier's nervousness "increased drastically" upon Fuller's arrival. Himmell asked Pelletier whether there were any weapons, drugs, or drug paraphernalia in the vehicle. Pelletier responded no as to each, but "he did smile" when asked about drugs and paraphernalia. Himmell then asked Pelletier for consent to search the car, and Pelletier consented.

¶11. Prior to the search, Pelletier volunteered that he had medication in the car. Himmell asked whether the medication was in proper containers, and Pelletier said that it was. Himmell then located three pill bottles in the center console of the car. The tablets in the first two bottles matched their labels, but the tablets in the third bottle did not. As noted above, the bottle's label said Adderall, but it actually contained twenty-four tablets of Vyvanse, a Schedule II controlled substance. When Himmell confronted Pelletier with this fact, Pelletier volunteered that his roommate could bring the correct prescription bottle to Flowood; however, the Flowood Police Department has never been provided with such a bottle.

¶12. Himmell then resumed his search and found metallic knuckles in a shoe box on the back seat and a switchblade knife in a black tool bag behind the passenger's seat. Pelletier stated that the metallic knuckles belonged to him and that he had purchased them about two months earlier at a flea market. He stated that the knife belonged to his roommate, whom he identified only as "Bryan." Pelletier's statements regarding the drugs and weapons were recorded in a video of the traffic stop. After Himmell completed his search, he placed

Pelletier under arrest.

¶13.    After the State rested its case-in-chief, the court inquired of Pelletier whether he understood and had been advised of his right to testify or not testify, and Pelletier confirmed that he did and that he intended to testify.  The court inquired whether the State would seek to introduce any of Pelletier's prior convictions, and the State indicated that it would not.  The court finally asked whether there were any other matters that needed to be taken up before resuming trial.  At that point, one of the prosecutors stated that Powers had mentioned something about "witnesses" but that the State had not been provided with "notice of any witness."  Powers then stated that he intended to call Chuck Cole, who he said was "Mr. Pelletier's boss."  The court asked what the substance of Cole's testimony would be, and Powers responded:

> I expect him to testify to, and I haven't discussed with Mr. Cole completely yet, in fact, if I can have a few minutes to, I expect him to testify that he's Mr. Pelletier's boss [and that on March 28, 2013,] he let Mr. Pelletier borrow a tool bag and that in that tool bag was [the metallic knuckles] that belongs to Mr. Cole . . . . And I believe he'll also testify that Mr. Pelletier would have had no way of knowing that [the metallic knuckles] were [in] that tool bag.  Mr. Pelletier just borrowed the tool bag to work on his car.

¶14.    The State responded that this was the first time it had ever heard the name Chuck Cole.  Powers stated that he had only met Cole that day and that Cole had come to the trial "in support of Mr. Pelletier," not intending to testify.  Pelletier then interjected that he had sent Powers his "whole witness list more than a week ago."  Pelletier stated that he sent Powers the list the day of the pre-trial conference, after the court admonished him to finish discovery.  Powers then acknowledged that Pelletier sent him "a list of several people," but

6

he thought that occurred "probably about five days ago." Powers said that he had not "had a chance to talk to all of" the people on the list, and admitted that he had not disclosed any names of potential witnesses to the State. Powers "guess[ed] maybe he should have disclosed the possible witnesses," but he "didn't make the final determination that [he] would actually put Mr. Cole on [until] after speaking to him the first time" on the day of trial. The court then took a short recess to allow the State to talk to Cole. *See* URCCC 9.04(I).

¶15. After interviewing Cole, the State objected to allowing him to testify. The State argued that Cole and his story were known to the defense and should have been disclosed. The State informed the court that it had learned from speaking to Cole that he was actually Pelletier's *stepfather* as well as his boss and had been married to Cole's mother for eleven years. The State further stated that Cole claimed that he loaned Pelletier the canvas bag full of tools and that the metallic knuckles were in the bag. According to the State, Cole claimed that *he* had purchased the knuckles at a flea market. The State argued that it had "no way to check[ ]out this story at all" given its late disclosure.

¶16. The court found that Cole was "a witness [who had] been known to [Pelletier] for some while" and who "should have been disclosed." The court reasoned that "at this late date the State is without the ability to really effectively cross-examine the witness or to do any investigation in order to be able to rebut the witness'[s] testimony." The court concluded that disclosing Cole for the first time after the State had rested its case was "basically trial by ambush" and that Pelletier "really offered no justification or excuse or reason as to why [Cole's] name . . . ha[d] not been disclosed previously." Accordingly, the court excluded

7

Cole's testimony.

¶17.    Pelletier then took the stand.  He claimed that Cole loaned him the tool bag so that he would have some tools with him in the event he had car problems on his trip.  Pelletier claimed he had no idea that the metallic knuckles were in the bag.  Pelletier said that Cole welds metallic knuckles to Harley-Davidson motorcycles as ornaments.

¶18.    With respect to the Vyvanse, Pelletier claimed that the medicine actually belonged to his roommate, identified only as "Bryan."  Pelletier claimed that after he had already driven halfway to Jackson, Bryan called and said that he had left his medication in Pelletier's car.  Pelletier said that it was too late for him to turn around, but he was worried that he might get in trouble if he were caught with Bryan's pills.  He then put Bryan's pills in one of his own prescription bottles "so he wouldn't get in trouble."

¶19.    On cross-examination, Pelletier admitted that the switchblade knife was his, although he was quick to add, "I was not charged with that knife."  He denied that the metallic knuckles were his.  He said he would like to "get a pair [of metallic knuckles] welded on [his] motorcycle," but had not done so "yet because of all this."  Pelletier also claimed that his "lawyer actually ha[d] [Bryan's] bottle and [Bryan's] paperwork" for the Vyvanse.  This was apparently a reference to a lawyer who represented him prior to Powers.  Pelletier volunteered that his "mom [could] tell [the prosecutor] the other lawyer's name."  Pelletier's roommate was never identified other than as "Bryan."

¶20.    The jury then deliberated and found Pelletier guilty on both charges.  After finding that Pelletier was a nonviolent habitual offender, the court sentenced him to twenty-four

8

years for possession of a Schedule II controlled substance and ten years for possession of a weapon as a felon, all in MDOC custody, with the sentences to be served concurrently.

¶21. Pelletier hired new counsel to file post-trial motions. He filed a motion for judgment notwithstanding the verdict, in which he argued that Powers provided ineffective assistance of counsel. The circuit court denied Pelletier's post-trial motions, and Pelletier timely appealed. On appeal, he raises two issues: ineffective assistance of counsel and the exclusion of Cole as a witness.

## ANALYSIS

### I.       Ineffective Assistance of Counsel

¶22. As our Supreme Court has explained,

> Ordinarily, ineffective-assistance-of-counsel claims are more appropriately brought during post-conviction proceedings. This is because during direct appeals the Court is limited to the trial court record in its review of the claim, and there may be instances in which insufficient evidence exists within the record to address the claim adequately. In such a case, the appropriate procedure is to deny relief, preserving the defendant's right to argue the issue through a petition for post-conviction relief.

*Archer v. State*, 986 So. 2d 951, 955 (¶15) (Miss. 2008) (citations omitted). This Court "may address such claims on direct appeal only if (a) 'the issues are based on facts fully apparent from the record,' or (b) the 'parties stipulate that the record is adequate,' and we 'determine that additional findings of fact by a trial judge are not needed.'" *Shinn v. State*, 174 So. 3d 961, 965 (¶11) (Miss. Ct. App. 2015) (quoting *Sandlin v. State*, 156 So. 3d 813, 819 (¶20) (Miss. 2013); *Read v. State*, 430 So. 2d 832, 841 (Miss. 1983)) (alterations omitted).

¶23. On appeal, Pelletier argues that his trial counsel was ineffective because he failed to

9

call "Bryan" as a witness, because his failure to comply with the discovery rules resulted in Cole's exclusion as a witness, and because he failed to oppose the State's motion to amend the indictment. However, on the record before us we know nothing about "Bryan," if he even exists, or why he was not called as a witness. Nor is the record clear as to why Cole was not disclosed to the State in a timely fashion or what exactly he might have said had he been able to testify. Put simply, the claim is not "based on facts fully apparent from the record." *Sandlin*, 156 So. 3d at 819 (¶ 20). Therefore, we affirm the circuit court's denial of relief on Pelletier's ineffective assistance claim. Pelletier may assert such a claim in a motion for post-conviction relief. *See id.*

## II.     Exclusion of Witness Testimony

¶24.    "The standard applied for appellate review of a trial court's sanction for discovery abuses is 'whether the trial court abused its discretion in its decision.'" *Lipsey v. State*, 50 So. 3d 341, 346 (¶12) (Miss. Ct. App. 2010) (quoting *Gray v. State*, 799 So. 2d 53, 60 (¶26) (Miss. 2001)). "Upon weighing all relevant factors in the case, unless there is clear error in judgment as to the sanctions imposed for violation of the discovery rule, this Court will affirm the imposed sanction." *McGregory v. State*, 979 So. 2d 12, 17 (¶7) (Miss. Ct. App. 2008).

¶25.    Pelletier argues that the trial court's exclusion of Cole as a witness was an abuse of discretion. He argues that the ruling violated his Sixth Amendment right to compulsory process under *Taylor v. Illinois*, 484 U.S. 400 (1988), and Mississippi caselaw interpreting Rule 9.04. Pelletier contends that Cole's exclusion was not an appropriate sanction because

10

his discovery violation was the result of Powers's "abject failure to adequately represent" him. However, given the egregiousness of Pelletier's violation of basic rules of discovery, the trial judge's decision to exclude Cole was not an abuse of discretion.

¶26. To begin with, *Taylor* itself, which also involved the exclusion of a witness who was disclosed for the first time during trial, specifically rejected the argument that it would be "unfair to visit the sins of the lawyer upon his client." *Taylor*, 484 U.S. at 416. As the Court explained,

> The argument that the client should not be held responsible for his lawyer's misconduct strikes at the heart of the attorney-client relationship. . . . Moreover, given the protections afforded by the attorney-client privilege and the fact that extreme cases may involve unscrupulous conduct by both the client and the lawyer, *it would be highly impracticable to require an investigation into their relative responsibilities [for failing to disclose a witness] before applying the sanction of preclusion.* In responding to discovery, the client has a duty to be candid and forthcoming with the lawyer, and when the lawyer responds, he or she speaks for the client. Putting to one side the exceptional cases in which counsel is ineffective, *the client must accept the consequences of the lawyer's decision . . . not to disclose the identity of certain witnesses in advance of trial.*

*Id.* at 417-18 (emphasis added).

¶27. *Taylor* also recognized that "[i]t is . . . reasonable to presume that there is something suspect about a defense witness who is not identified until after the 11th hour has passed." *Id.* at 414. Therefore, a "trial judge may certainly insist on an explanation for a party's failure to comply with a request to identify his or her witnesses in advance of trial." *Id.* at 415. That is precisely what the trial judge did in this case—and there was no legitimate excuse for the failure, only disagreement between Pelletier and Powers as to whether Pelletier had given Powers a list of potential witnesses five or sixteen days prior to trial.

11

¶28.    *Taylor* goes on to say that if the defendant's "explanation reveals that the omission was willful and motivated by a desire to obtain a tactical advantage that would minimize the effectiveness of cross-examination and the ability to adduce rebuttal evidence, it would be entirely consistent with the purposes of the Compulsory Process Clause simply to exclude the witness'[s] testimony." *Id.* at 415. But as our own Supreme Court subsequently explained, *Taylor* does not purport to identify the *only* circumstances in which the sanction may be imposed: "If a particular remedy 'would be consistent' with the Constitution under a particular set of circumstances, it is a stretch of legal gymnastics to argue, as [the defendant] does, that a particular remedy is permissible *only* in that set of circumstances." *Coleman v. State*, 749 So. 2d 1003, 1010 (¶17) (Miss. 1999) (quoting *Taylor*, 484 U.S. at 415). "Allowing a trial judge the discretion to exclude otherwise admissible evidence on the basis of an intentional discovery violation, even when less drastic sanctions are available, undergirds the principles of fairness in our adversarial system." *Id.* at 1009-10 (¶17).

¶29.    In *Houston v. State*, 752 So. 2d 1044 (Miss. Ct. App. 1999), a case that in some notable respects mirrors this one, this Court affirmed the trial court's exclusion of an alibi witness as a sanction for the defendant's attorney's intentional discovery violation, reasoning as follows:

> Not only did defense counsel completely ignore the State's request for alibi defense information, the attorney could not even make a proffer of the exact nature of these witnesses' alibi information on the morning of trial because, even at such a late date, he had not interviewed these potential witnesses to discover the nature of their story. It is difficult to envision a more flagrant and wilful disregard for the rules governing the conduct of a criminal prosecution. If the rules of discovery relating to alibi defenses can be so blatantly ignored without any consequence beyond a possible continuance to permit the State to

12

prepare to meet the alibi evidence, then . . . the rule might as well be deleted from the books.

*Id.* at 1047 (¶13).

¶30. This case does not involve an alibi witness, but the same concerns apply. Even if we credit for the sake of argument Pelletier's unsworn assertions that he gave Powers the names of witnesses just before the final, court-ordered deadline for disclosure, the fact remains that, like the attorney in *Houston*, Powers simply ignored the State's discovery requests and, even after the State had rested its case, could not proffer the exact nature of Cole's testimony. "It is difficult to envision a more flagrant and willful disregard for the rules governing the conduct of a criminal prosecution." *Id.* This intentional violation of the discovery rules was a sufficient ground to support the sanction of exclusion. *Id.* Contrary to Pelletier's arguments on appeal, the trial judge was not required to attempt a mid-trial "investigation into [Pelletier's and Powers's] relative responsibilities before applying the sanction of preclusion." *Taylor*, 484 U.S. at 418. Rather, Pelletier "must accept the consequences of [Powers's] decision . . . not to disclose the identity of certain witnesses in advance of trial." *Id.*

¶31. To return to *Houston*'s final concern, if the requirements of Rule 9.04 "can be so blatantly ignored without any consequence beyond a possible continuance . . . , then . . . the rule might as well be deleted from the books." *Houston*, 752 So. 2d at 1047 (¶13). The issue in this case is whether exclusion of a witness is a permissible sanction when the defendant

13

withholds the identity of the witness[2] *until after the State has rested its case* and then offers absolutely no legitimate excuse for his blatant violation of the discovery rules. If the law did not permit the sanction of exclusion of the witness even on these facts, then there would be very little reason or incentive for a criminal defendant to comply with Rule 9.04.

¶32. Finally, Pelletier also argues that the State failed to comply with Rule 9.04(I)(2) because, after interviewing Cole, the State did not request a continuance. At that point, the trial judge heard brief argument, including the State's position that there was no way it could investigate Cole's story given the timing of his disclosure. Having considered the issue, the trial judge declined to "delay the trial in this matter." Given that the trial judge actually considered whether to delay the trial, the State's failure to make such a request is moot. In any event, "[w]hile it is true that a continuance must be sought before a party can complain of the admission of previously undisclosed evidence, *a request for a continuance is not a prerequisite to the exclusion of such evidence, and the failure to request a continuance does not waive an objection that has been sustained*." *De La Beckwith v. State*, 707 So. 2d 547, 574 (¶101) (Miss. 1997) (emphasis added). Under Rule 9.04(I), "a surprised party should ordinarily request a continuance when confronted with undisclosed evidence," but "*the failure to do so does not abrogate the trial court's discretion to exclude such evidence in certain circumstances*." *Id.* (emphasis added). In appropriate cases, "the exclusion of testimony [is] an option well within the trial court's discretion" even if "the prosecution did not request a continuance." *Id.* at 574-75 (¶102) (affirming the exclusion of a defense

---

[2] This case does not even involve a witness who was difficult to find or who came to the defendant's attention shortly before trial. Again, Cole is Pelletier's stepfather and boss.

14

witness who, like Cole, was disclosed only after the State rested its case-in-chief).

¶33.    Having considered Pelletier's arguments, we do not ignore the possibility that he was prejudiced by his attorney's failure to comply with the discovery rules.  As noted above, *Taylor* held that "the client must accept the consequences of the lawyer's decision . . . not to disclose the identity of certain witnesses in advance of trial," but it did so while "[p]utting to one side the exceptional cases in which counsel is ineffective." *Taylor*, 484 U.S. at 418. As we have already held, Pelletier's claim of ineffective assistance is a subject for a PCR motion, not direct appeal.  Powers's alleged responsibility for discovery violations certainly may be raised as part of a comprehensive ineffective assistance claim.  Indeed, that is the nature of Pelletier's argument on appeal: that he was prejudiced by Powers's failure to follow the rules.  That is a claim of ineffective assistance of counsel; the claim may or may not be viable, but its underlying facts require further development in a PCR motion.  More important, that claim must be distinguished from the issue properly before us on direct appeal: whether the trial judge abused his discretion on the facts presented to him by imposing a serious sanction for a blatant and intentional violation of the discovery rules.  We find no abuse of discretion.  Therefore, we affirm.

¶34.    **THE JUDGMENT OF THE RANKIN COUNTY CIRCUIT COURT OF CONVICTION OF POSSESSION OF A SCHEDULE II CONTROLLED SUBSTANCE AND POSSESSION OF A WEAPON BY A FELON AND SENTENCE AS A HABITUAL OFFENDER OF TWENTY-FOUR YEARS FOR POSSESSION OF A SCHEDULE II CONTROLLED SUBSTANCE AND TEN YEARS FOR POSSESSION OF A WEAPON BY A FELON, WITH THE SENTENCES TO RUN CONCURRENTLY, ALL IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS,  AND TO PAY FINES OF $500,000 AND $5,000, IS AFFIRMED.  ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.**

**LEE, C.J., GRIFFIS, P.J., FAIR AND GREENLEE, JJ., CONCUR. JAMES, J., CONCURS IN PART WITHOUT SEPARATE WRITTEN OPINION. ISHEE, J., DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY IRVING, P.J., BARNES, CARLTON AND JAMES, JJ.**

**ISHEE, J., DISSENTING IN PART:**

¶35.    With respect to the majority, I must dissent regarding the affirmance of Pelletier's conviction of felon in possession of a weapon. The majority references Pelletier's contention "that Cole's exclusion was not an appropriate sanction because his discovery violation was the result of Powers's 'abject failure to adequately represent' him." To be clear, I make no determination as to Powers's efficacy as Pelletier's lawyer. As stated previously, matters of ineffective assistance of counsel are best reviewed in a PCR proceeding. *Aguilar v. State*, 847 So. 2d 871, 878 (¶17) (Miss. Ct. App. 2002) (citations omitted).

¶36.    The question here, rather, is whether or not the trial court's decision to exclude Cole's testimony under Rule 9.04(I) was the proper remedy. We have previously held that "a violation of Rule 9.04 is considered harmless error unless it affirmatively appears from the entire record that the violation caused a miscarriage of justice." *Mosely v. State*, 4 So. 3d 1069, 1074 (¶10) (Miss. Ct. App. 2009) (quoting *Wyatt v. City of Pearl*, 876 So. 2d 281, 284 (¶10) (Miss. 2004)). In the instant case, I cannot find that the late introduction of Cole as a witness "caused a miscarriage of justice." *Id*.

¶37.    The State was given the opportunity to interview Cole. The record reflects that Cole's testimony would have served to corroborate Pelletier's theory of defense – that the metallic knuckles discovered in the vehicle were Cole's, not Pelletier's, and that they had been purchased by Cole at a flea market when Cole and Pelletier were together. The State's

16

objection hinged on its contention that it had no way of investigating Cole's assertion that the metallic knuckles were bought by him at a flea market. However, the State was already armed with the video recording presented to the jury showing Pelletier mentioning to the arresting officers that he, not Cole, may have purchased the metallic knuckles at the flea market. Accordingly, the State had evidence in its possession with which it could have discredited Cole's testimony.

¶38. Pelletier, on the other hand, had his testimony and nothing else to support his theory of defense with regard to the metallic knuckles. He testified on his own behalf and spoke regarding the metallic knuckles belonging to Cole. Pelletier had a right to call relevant and material witnesses to help support his case and corroborate his testimony. This is particularly so when, as noted previously, the State introduced evidence to the jury showing that Pelletier initially indicated that the metallic knuckles may have been his. Hence, the addition of corroborating testimony could have made a material difference in how the jury viewed the case. I find that the discovery violation was harmless error and that the exclusion of the testimony constituted prejudicial error for Pelletier. Hence, I would reverse and remand the conviction of felon in possession of a weapon.

**IRVING, P.J., BARNES, CARLTON AND JAMES, JJ., JOIN THIS OPINION.**

17