# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-KA-01515-COA

**JERMEKA BLAKELY A/K/A JERMEKA WILSHAN BLAKLEY A/K/A JERMEKA W. BLAKLEY**                    **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                    **APPELLEE**

DATE OF JUDGMENT: 10/04/2018
TRIAL JUDGE: HON. CHARLES W. WRIGHT JR.
COURT FROM WHICH APPEALED: CLARKE COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT: ERIC JOHN HESSLER
ATTORNEY FOR APPELLEE: OFFICE OF THE ATTORNEY GENERAL
BY: KAYLYN HAVRILLA McCLINTON
DISTRICT ATTORNEY: BILBO MITCHELL
NATURE OF THE CASE: CRIMINAL - FELONY
DISPOSITION: AFFIRMED - 06/02/2020
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

EN BANC.

CARLTON, P.J., FOR THE COURT:

¶1. In a joint trial, a Neshoba County Circuit Court jury convicted Jermeka Blakely and Marcus McFarland of cocaine trafficking. This appeal concerns Blakely. The trial court sentenced Blakely to serve twenty years in the custody of the Mississippi Department of Corrections (MDOC). Blakely now appeals his conviction and sentence, asserting three assignments of error: (1) the trial court committed reversible error when it excluded the testimony of defense witness Donald Ray Arrington; (2) Blakely's indictment was fatally defective because it identified the controlled substance at issue, cocaine, as a Schedule I

controlled substance instead of as a Schedule II controlled substance; and (3) Blakely's

constitutional right to be free from cruel and unusual punishment was violated by the

allegedly unconstitutional application of the "trafficking" sentencing guidelines established

under Mississippi Code Annotated section 41-29-139(f) (Rev. 2018). Upon review, we find

no error. We therefore affirm Blakely's conviction and sentence.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

¶2.     Blakely and McFarland were jointly indicted in February 2018 by a Clarke County

grand jury. The indictment stated that Blakely and McFarland "as part of a common plan or

scheme or as part of the same transaction or occurrence in [Clarke] County . . . on or about

[August 8, 2017,] . . . did wilfully, unlawfully, and feloniously and knowingly traffic 118.379

grams of Cocaine, a Schedule I controlled substance, in violation of [Mississippi Code

Annotated] [s]ection 41-29-139(f)(c) [(Rev. 2018)] . . . ."[1]  With the assistance of counsel,

Blakely waived arraignment and entered a plea of not guilty in March 2018.

¶3.     Defendants Blakely and McFarland were tried jointly in a jury trial beginning

September 11, 2018, in the Clarke County Circuit Court. They were represented by separate

counsel. During voir dire, Blakely's lawyer informed the trial court that there was a

possibility that Arrington may be called as a defense witness. After the jury was empaneled

and sworn in, the court held a recess. At that time, Blakely's counsel confirmed that he

sought to call Arrington as a witness and summarized Arrington's proposed testimony as

---

[1] Blakely was also separately indicted on the same date for possession of 4.835 grams of marijuana with intent to sell, in violation of Mississippi Code Annotated section 41-29-139 (Rev. 2018). The trial court entered an order of nolle prosequi regarding this count of Blakely's indictment.

2

follows:

> [Arrington] would testify that he was present in the area . . . near the scene, and he observed the officers exit the vehicle, go up to two gentlemen [the defendants] who were speaking . . . at the front of the vehicle. They were detained and searched. The car was searched, the area was searched, and that [the] police left shortly thereafter. [H]e would testify that he didn't see either of the defendants make any overt movements, attempt to flee, throw down anything, exchange anything during this entire time that he witnessed the incident.

¶4. Blakely's counsel also told the trial court that Arrington had apparently attended an earlier habeas corpus hearing for Blakely's co-defendant, McFarland, in September 2017 and that Arrington told him that he had spoken "to the sheriff about what he witnessed" after that hearing. Blakely's trial counsel was not his lawyer at that time. McFarland's trial counsel also informed the trial court that he was not McFarland's counsel at the time of the habeas corpus hearing and that he did not know about Arrington until the night before trial.

¶5. Blakely's counsel told the State about Arrington for the first time that morning, and Arrington was at the courthouse at defense counsel's request. The State interviewed Arrington during the lunch recess and learned in that interview that there was at least one other man (later identified as Terry Roberts) with Arrington on the day of the incident.

¶6. The State moved to exclude Arrington's testimony because Blakely's counsel had not served reciprocal discovery regarding Arrington and thus had failed to comply with the applicable discovery rules. The State also informed the trial court that in the course of interviewing Arrington, it learned about Roberts, and it would need time to interview this witness if the trial court did not exclude Arrington's testimony.

¶7. Blakely's counsel said that he did not know about Arrington's existence until the night

3

before trial began; he told the State about this witness that morning of trial; and he did not know about the other witness (Roberts) until he learned that Arrington mentioned him when he was interviewed by the State that morning. Blakely's counsel also told the trial court that neither Arrington nor Roberts were under subpoena. The trial court took the matter under advisement at that point and, on its own motion, issued an instanter subpoena to have both Arrington and Roberts present to allow the State an opportunity to interview Arrington again and interview Roberts.

¶8.    The State's first witness was Ben Ivy, a narcotics agent with the Clarke County Sheriff's Department. He testified that he and Agent Mike McCarra were driving through a neighborhood in Shubuta, Mississippi on August 8, 2017. Agent McCarra was driving his truck and he (Agent Ivy) was in the passenger seat. Agent Ivy saw two men, Blakely and McFarland (he knew them by sight), bent over the trunk of a Nissan Maxima. Agent Ivy also testified that he saw a bag the size of a softball sticking up out of the trunk with a white substance in it that he believed to be cocaine. Ivy testified that he said to Agent McCarra that the men "had dope." Agent McCarra also testified for the State and corroborated Agent Ivy's testimony on this point, and both he and Agent Ivy testified that McCarra then turned the truck into the yard where the Maxima was parked.

¶9.    Agent Ivy testified that as they pulled up, he saw McFarland remove the plastic bag with the white-powder substance from the trunk and hand it to Blakely. He said that Blakely began to walk away and threw this bag into some nearby bushes. Agent McCarra testified that from where he was he did not see anything thrown into the bushes.

4

¶10.    Both agents testified that they told Blakely to stop and Agent McCarra was able to keep Blakely from leaving the scene. Agent Ivy walked over to McFarland who at that point was standing at the rear end of the Maxima. Agent Ivy testified that he saw scales in the trunk of the car that were still "powered on," a bag of marijuana on the front passenger seat in plain view, and a firearm by the gear shift next to the marijuana. He testified that he then handcuffed McFarland and told Agent McCarra what he had seen. Agent McCarra testified that he then handcuffed Blakely, and McFarland and Blakely were put in McCarra's truck. Agent Ivy testified that after the men were handcuffed, "people started coming, walking out onto their lawn, videoing us with their cell phones."

¶11.    Agents Ivy and McCarra testified that backup was called and that Justin Rawson, who was a deputy at the time with the Clarke County Sheriff Department, arrived after McFarland and Blakely were handcuffed. Agents Ivy and McCarra and Deputy Rawson all testified that Deputy Rawson found the bag of cocaine in the bushes. Agent Ivy testified the scales were recovered from the Maxima's trunk, and they also recovered the marijuana. He also testified that $4,800 in cash and another bag of marijuana were found in Blakely's pockets. A gun was also located in the car, which Blakely claimed that he owned. Both Agents Ivy and McCarra testified that the bag of cocaine was secured into the evidence locker and sent to a lab for testing. The State's witness, Jaime Johnson, who was accepted without objection as an expert in the field of chemistry and narcotics analysis, testified that she analyzed the white powdery substance collected from the scene and determined it was cocaine.

¶12.    The State rested its case. Blakely moved for a directed verdict, which the trial court

denied.  After the State rested and the trial court denied Blakely's motion for a directed

verdict, the trial court again re-visited the State's motion to exclude any testimony from

Arrington and ultimately ruled that Arrington's testimony would be excluded.  We will

address additional facts and the trial court's ruling relating to this issue in our discussion

below.

¶13.    After the State's motion to exclude Arrington's testimony was granted, the defense

rested without calling any witnesses.  The jury unanimously found Blakely and McFarland

guilty of trafficking cocaine.  After allowing for a pre-sentencing investigation, the trial court

conducted a sentencing hearing for Blakely on October 4, 2018.  The trial court sentenced

Blakely to serve a term of twenty years in the custody of the MDOC, with Blakely being

ineligible for parole or probation during the first ten years of the sentence pursuant to

Mississippi Code Annotated section 41-29-139(f)(1).  Blakely was also ordered to pay a fine

of $10,000, $300 to the crime lab, a $1,200 appearance bond fee, and court costs of $455.50,

all due upon his release from the MDOC.  Blakely filed a motion for judgment

notwithstanding the verdict or, in the alternative, a new trial, which the trial court denied.

Blakely appeals.

## DISCUSSION

### I.      Exclusion of Arrington's Testimony

¶14.    Blakely asserts that the trial court committed reversible error when it excluded

Arrington's testimony and thereby deprived him of his due process right to a fair and

impartial trial.  He claims that the State failed to inform him of Arrington's existence and

6

thus withheld exculpatory or impeachment evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Blakely also asserts that the trial court erred when it excluded Arrington's testimony as a discovery sanction. For the reasons addressed below, we find no merit in either of these assertions.

### A. Additional Facts and the Trial Court's Ruling

¶15. We begin by addressing the additional facts and the trial court's ruling relating to this issue. As noted above, the trial court took this issue under advisement the first time it heard the parties after the jury had been empaneled and sworn in. Halfway through the State's case-in-chief, during another recess, the State informed the trial court that it had briefly talked to Arrington and had also interviewed Roberts. In these interviews, the State said that it had "been given even more names of people that, according to them, were out on the scene at the time." Arrington also brought photographs of what he claimed were "his line of sight."

¶16. The State re-asserted its motion to exclude Arrington (and Roberts, who was later dropped by the defense as a witness) from testifying at trial because they had never been identified in reciprocal discovery. Blakely's counsel explained that he had just begun representing Blakely about six months before trial started. He admitted that he "was aware that there were allegations that people had been out there . . . on that day, but [that he] didn't have any idea who they [were]."

¶17. The trial court asked Blakely's counsel what he had done to prepare for trial, and he explained that he had read the State's discovery and discussed the case with his client several times. The trial court ended this hearing as follows: "I'm going to take this under advisement

7

. . . and I will make a ruling after the State closes. . . . [T]he purpose of reciprocal discovery is to prevent surprise such as this . . . . [T]he State . . . [is] . . . entitled to not only interview the witness, but investigate whatever the witness would testify to." The trial court further observed that for defense counsel to call Arrington or Roberts "at this late date . . . is concerning to the Court. . . . [T]his matter should have been investigated, and reciprocal discovery should have been submitted to the State prior to the first day of trial. But I'm going to take it under consideration."

¶18. After the State rested, the trial court again re-visited the State's motion to exclude any testimony from Arrington and Roberts.[2] The trial court questioned Blakely's counsel and established that he had requested and received discovery from the State and that he did not furnish any written reciprocal discovery. On the morning of trial, Blakely's counsel told counsel for the State about Arrington and the substance of the testimony Arrington was expected to give.

¶19. The trial court asked how Blakely's counsel learned about Arrington. He said that his client had found Arrington and called him (his counsel) about Arrington the night before trial. Blakely's counsel said he then talked to Arrington and learned that Arrington had been asked to be at McFarland's September 2017 habeas corpus hearing to testify as a witness. Arrington apparently did not testify, but he did listen to the agents' testimony about the incident, and his recollection was very different from their portrayal of the incident.

---

[2] At this point Blakely's counsel said he was requesting that he be allowed to present the testimony of both Roberts and Arrington in Blakely's defense. McFarland's counsel confirmed that he did not seek to present either of these witnesses in McFarland's defense.

¶20. Seeking clarification, the trial court asked Blakely's counsel if McFarland's habeas corpus hearing was transcribed, and, if it was, whether he had obtained a copy of the transcript. Blakely's counsel admitted he had obtained a transcript of McFarland's habeas corpus proceeding about two weeks before trial.[3] The trial court then stated that consistent with Uniform Rule of Circuit and County Court Practice 9.04 (Mississippi Rule of Criminal Procedure 17.9)[4] it had granted the State the opportunity to interview Arrington, and the State had done so. The trial court then directed defense counsel to call Arrington to the stand and to proffer his testimony.

¶21. Arrington testified that he and Roberts were sitting outside in Roberts's carport when he saw McFarland and Blakely across the street. He stated that the two defendants were talking to each other near the front door of Blakely's car and that the trunk was not open. Arrington testified that the officers (Ivy and McCarra) came up in a blue truck. Ivy yelled, "[D]rug bust, drug bust, drug bust," and the defendants just stood there and the officers handcuffed them. According to Arrington, he then heard Blakely say, "You don't have to search my car, you don't have to search my car. . . . I got a bag of weed in my pocket, some money, and a scale, but I don't sell dope." Arrington testified that Ivy searched the car,

---

[3] The record does not contain a copy of McFarland's habeas corpus hearing transcript, nor is there a copy of this hearing transcript in McFarland's record on appeal in case number 2019-KA-00176-COA.

[4] Although the trial court referred to Rule 9.04 of the Uniform Rules of Circuit and County Court Practice, which applied prior to July 1, 2017, the Mississippi Rules of Criminal Procedure were actually in effect during the relevant time period. Blakely was indicted and tried in 2018. Rule 17 of the Mississippi Rules of Criminal Procedure tracks the relevant portions of Uniform Rule 9.04 verbatim. For accuracy we indicate the applicable section of that rule in parentheses.

brought out a gun from the front seat, took the keys out of the car's ignition, unlocked the trunk, and searched it. Arrington testified that he never saw any cocaine, never saw the defendants exchange anything, never saw Blakely get rid of anything, and he never saw Blakely try to evade either officer.

¶22. Arrington also testified that in September 2017 he attended a habeas corpus hearing for McFarland at the request of one of McFarland's family members. He said that he did not testify at the hearing but that he was in court and heard the officers' testimony. After the hearing was over he saw Clarke County Sheriff Todd Kemp. Arrington testified that Sheriff Kemp was a friend of his from when Arrington used to be a jailer. Arrington then testified as follows:

> [Sheriff Kemp] shook my hand. . . . I looked into his eyes, and I said, "Todd, you know I don't lie. You know I don't lie to you." And he said to me, "I know." . . . I said, "Todd, that [what] went on in there, that wasn't right." And he looked at me . . . and I said, "Because I was there." And by the time I released his hand, I told him, "Look, if those people have me to come to court to testify, I'm subpoenaed, I'm going to tell what I saw." He said, "You be sure you tell what you saw."

¶23. On cross-examination, the State asked Arrington, "[W]hen you spoke to the sheriff and said 'What went on in there, that ain't right,' did you provide him any of the details that you provided to the Court today?" Arrington responded, "No. No."

¶24. Arrington also testified that Roberts (the other witness) was a schizophrenic who hears voices and stabbed himself once in the pancreas. After Arrington finished testifying and was taken back to a witness room, Blakely's counsel told the trial court he no longer anticipated calling Roberts as a defense witness.

¶25. The trial court then addressed Blakely's counsel, observing that he had been appointed as Blakely's lawyer six months earlier and did not seek a continuance for additional discovery or file a notice of newly-discovered evidence prior to voir dire with respect to Arrington or Roberts. Continuing, the trial court then stated:

> [Instead,] you wait[ed] until the jeopardy is attached to your client. Give the Court some reason for this—other than the purpose is intentionally done to either require this Court to declare a mistrial or declare that you cannot present this witness as—in your defense or give you the advantage that the State doesn't have the time to investigate.

Blakely's counsel offered that he could only present evidence of Arrington when he learned of him. The trial court reminded him that he never filed a motion for newly discovered evidence and remarked that counsel was just now indicating that he did not want to call Roberts as a witness.

¶26. Ultimately, the trial court granted the State's motion to exclude Arrington's testimony, finding that Blakely had violated Uniform Rule of Circuit and County Court Practice 9.04 (Mississippi Rule of Criminal Procedure 17.3) by failing to name a witness in reciprocal discovery and that excluding Arrington's testimony was the proper sanction. The trial court supported its ruling with the following findings:

> That on Monday, September 10th, we had pretrial motions. This matter was not brought to the Court's attention at that time. [T]he Defendant Blakely noticed to . . . the State, in the afternoon of the first day of trial[,] of its request to have witnesses Donald Ray Arrington and Terry Roberts testify consistent with a proffer that they were eyewitnesses to the stop and arrest of Blakely and McFarland. There was no motion for continuance for newly discovered evidence. A review of the court file finds that Defendant Blakely filed no subpoena for the witness Arrington or the witness Roberts. The Court, of its own motion, issued an instanter subpoena to have both Arrington and Roberts present today to give the State the opportunity to interview the witnesses,

11

which the State has affirmed [that it has done so].

The trial court further stated that it required Blakely to proffer Arrington's testimony and that during that testimony and the trial court's own questioning of Blakely's counsel, "it became patently obvious" that the McFarland family knew of his existence as a potential witness; that Blakely had a copy of the transcript of the habeas corpus hearing "some two weeks prior to trial; . . . [and] that the discovery indicated that there were other persons present at the time of the arrest and the finding of the cocaine that's charged in the indictment."

¶27. Additionally, the trial court found that Arrington "testified that he told the sheriff about his eyewitness account; however, on cross-examination, he only indicated that he stated to the sheriff that it wasn't right." With respect to this point, the trial court found that "there was no duty upon the sheriff to continue to investigate concerning Arrington's statement to him, that it did not have any substantive facts to support it . . . . Therefore, the Court does not find that this would be . . . exculpatory evidence that should have been reviewed by the sheriff's department."

¶28. Regarding the reasons offered by Blakely's counsel for failing to notify the State of this witness and his substantive testimony, the trial court found that it "only heard that the defendant lived in Texas, and . . . was out on bond . . . . Therefore, [defense counsel had the ability] . . . to consult with his client and also the ability to investigate the facts that surround the charges in the indictment."

¶29. The trial court concluded as follows:

The Court, in the interest of justice, finds that it's unfair to the State to have
a defense witness submitted during the course of the trial when there were

12

other procedural avenues in which the defendant could have pursued; that at this late date, the State has no time to investigate or to determine if there is impeachable evidence as to any of the statements of . . . Arrington, and there has been submitted nothing that would support the excusable neglect of not naming him as a witness, subpoenae[ing] him as a witness, and providing the reciprocal discovery as required under the rule.

## B.     Brady Violation

¶30.   We first address Blakely's *Brady* violation contention.  Blakely asserts that the State knew of Arrington's existence in September 2017 (one year before Blakely's trial) when Arrington spoke to Sheriff Kemp after McFarland's habeas corpus hearing.  According to Blakely, this occurrence obligated the State to inform the defense of Arrington's existence.  Because the State did not do so, Blakely contends that the State improperly withheld exculpatory or impeachment evidence in violation of *Brady*, thus entitling him to reversal of his conviction and sentence or a new trial.

¶31.   "Under *Brady v. Maryland*, 'suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'"  *Lofton v. State*, 248 So. 3d 798, 810 (¶43) (Miss. 2018) (quoting *Brady*, 373 U.S. at 87).  This includes impeachment evidence.  *Manning v. State*, 929 So. 2d 885, 891 (¶15) (Miss. 2006).  The Mississippi Supreme Court has articulated a four-prong test applicable in determining whether a defendant has proved that a *Brady* violation has occurred, as follows:

> The defendant must prove: (a) that the State possessed evidence favorable to the defendant (including impeachment evidence); (b) that the defendant does not possess the evidence nor could he obtain it himself with any reasonable diligence; (c) that the prosecution suppressed the favorable evidence; and (d) that had the evidence been disclosed to the defense, a reasonable probability

13

exists that the outcome of the proceedings would have been different.

*Id.* (citation omitted).

¶32.    "[E]vidence is not deemed suppressed if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence." *Lofton*, 248 So. 3d at 810 (¶43) (citation and internal quotation mark omitted).  "And the State has no obligation to furnish a defendant with exculpatory evidence that is fully available to the defendant or that could be obtained through reasonable diligence.  *Id.*

¶33.    We review alleged *Brady* violations de novo, *Thomas v. State*, 45 So. 3d 1217, 1219 (¶7) (Miss. Ct. App. 2010), "though we defer to factual findings underlying the [trial court's] decision." *United States v. Swenson*, 894 F.3d 677, 683 (5th Cir. 2018).  After review, we find that Blakely has not made a cognizable *Brady* claim.

¶34.    First, we find no evidence in the record that the State "possessed" impeachment or exculpatory evidence with respect to Arrington.  Citing *Kyles v. Whitley*, 514 U.S. 419 (1995), among other cases, Blakely asserts that the State was obligated to learn of Arrington's existence because Arrington had spoken to Sheriff Kemp. *Id.* at 437.  However, the State asked Arrington in cross-examination, "[W]hen you spoke to the sheriff and said[,] 'What went on in there, that ain't right,' did you provide him any of the details that you provided to the Court today?"  Arrington responded, "No. No."  As the trial court found, Arrington's statement to Sheriff Kemp had no substantive facts to support it, and we find that Arrington's vague statement to Sheriff Kemp did not constitute exculpatory or impeachment evidence.

¶35. Second, even if we could find that the State had exculpatory or impeachment evidence with respect to Arrington, such "evidence is not deemed suppressed if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence." *Lofton*, 248 So. 3d at 810 (¶43) (citation and internal quotation mark omitted). In this case, Arrington testified that he was at McFarland's habeas corpus hearing at the request of a McFarland family member. Arrington further testified that he told Sheriff Kemp that he intended to "tell what he saw" if he were subpoenaed by the defendant to testify at trial. It is plain that Blakely's co-defendant, McFarland, knew of Arrington's existence and Blakely's own trial counsel obtained the transcript of McFarland's habeas corpus hearing two weeks before trial. Although the defendants' current trial counsel told the trial court that they did not have a joint defense agreement, there is no indication in the record that the defendants' prior lawyers did not share information.

¶36. Similarly, case precedent also establishes that the State is not obligated "to furnish a defendant with exculpatory evidence that is fully available to the defendant or that could be obtained through reasonable diligence." *Id.*, *see Rector v. Johnson*, 120 F.3d 551, 558-59 (5th Cir. 1997) ("The State has no obligation to point the defense toward potentially exculpatory evidence when that evidence . . . can be discovered by exercising due diligence."). Defense counsel admitted that he knew from the police report that there were other people present when the incident occurred, but he simply failed to investigate this avenue further. As the trial court found, and as the record reflects, counsel did not seek a continuance for further discovery when he was appointed as Blakely's counsel only six

15

months before trial, nor did he seek a continuance before trial started once he claims he discovered Arrington. The trial court specifically asked defense counsel whether Blakely was out on bond, and defense counsel responded that he was. Thus, the trial court confirmed that seeking a continuance would not have prejudiced Blakely, as he was not confined.

¶37. Defense counsel told the trial court that he had conferred with his client several times and reviewed the discovery furnished by the State. He did not, however, do any other investigation. He admitted to the trial court that it was Blakely, not himself, that located Arrington.

¶38. In short, our review of the record reveals that any information about Arrington or any information he may have had was fully available to Blakely or could have been obtained in the exercise of due diligence. Accordingly, we find that even if Blakely could prove that the State "possessed" exculpatory or impeachment evidence with respect to Arrington, the State was under no obligation to furnish it to Blakely. *Lofton*, 248 So. 3d at 810 (¶43). Blakely has not established a *Brady* violation, and we find this issue is without merit.

### C. Discovery Violation

¶39. Blakely also asserts that the trial court erred when it excluded Arrington's testimony as a discovery sanction. The Court's standard of review on this issue is as follows:

> The standard applied for appellate review of a trial court's sanction for discovery abuses is whether the trial court abused its discretion in its decision. Upon weighing all relevant factors in the case, unless there is clear error in judgment as to the sanctions imposed for violation of the discovery rule, this Court will affirm the imposed sanction.

*Pelletier v. State*, 207 So. 3d 1263, 1268 (¶24) (Miss. Ct. App. 2016) (citations and internal

16

quotation marks omitted). We find that the trial court did not abuse its discretion in excluding Arrington's testimony in this case.

¶40. We first address the trial court's determination that Blakely violated his discovery obligations when he failed to serve reciprocal discovery concerning Arrington in this case. Mississippi Rule of Criminal Procedure 17, applicable in this case,[5] sets forth a defendant's discovery obligations, as follows:

> If the defendant requests discovery under Rule 17, the defendant shall, subject to constitutional limitations, promptly disclose to the prosecutor . . . the following information and material . . . which is in the possession, custody, or control of the defendant or the defendant's attorney, or the existence of which is known, *or by the exercise of due diligence may become known*, to the defendant or defendant's counsel:
>
> > (1) Names and addresses of all witnesses in chief which the defendant may offer at trial, together with a copy of the contents of any statement (written, recorded or otherwise preserved) of each such witness and the substance of any oral statement made by any such witness. . . .

MRCrP 17.3 (emphasis added).

¶41. In addressing the State's motion to exclude Arrington's testimony at trial, the trial court questioned Blakely's counsel regarding his discovery obligations. The record reflects that Blakely's counsel had requested and received discovery from the State, but the defense did not furnish any written reciprocal discovery. On the morning of the first day of trial, Blakely's counsel told the State about Arrington and the substance of the testimony

---

[5] As noted, the trial court referred to Rule 9.04 of the Uniform Rules of Circuit and County Court Practice in ruling on this issue. Blakely and McFarland were indicted and tried in 2018, after the Mississippi Rules of Criminal Procedure were adopted and made effective July 1, 2017. For accuracy, we refer to Rule 17 of the Mississippi Rules of Criminal Procedure.

Arrington was expected to give—namely that he was a witness to the defendants' stop and arrest and that his version of the events that occurred was not the same as that of the officers' accounts that Arrington had heard at McFarland's habeas corpus hearing in September 2017.

¶42. In determining that Blakely had violated his discovery obligations, the trial court found that in "the exercise of due diligence," Blakely's counsel should have known of Arrington's existence and the substance of his testimony prior to trial and provided it to the State in advance of trial. MRCrP 17.3(1). As we have addressed above and as we will address in further detail in the following paragraphs, Blakely's counsel exercised no such due diligence. We find no abuse of discretion in the trial court's determination that Blakely violated his discovery obligations by failing to timely furnish Arrington's name, address, and the substance of his testimony in reciprocal discovery. *Id.*; *see Davis v. State*, 243 So. 3d 222, 236 (¶64) (Miss. Ct. App. 2017).

¶43. Blakely asserts, however, that the trial court's decision to exclude Arrington's testimony as a discovery sanction was reversible error. The State moved to exclude Arrington's testimony after interviewing Arrington twice, as well as Roberts (the other witness Blakely sought to call, but later withdrew),[6] asserting that there was no time to

---

[6] Defense counsel did not confirm that he intended to call Arrington (and Roberts) until after the jury was empaneled and sworn in—i.e., after the trial had begun. *See* 3 Jeffrey Jackson & Mary Miller, *Encyclopedia of Mississippi Law*, § 23:313, 875 (2d ed. 2016) ("Double jeopardy attaches in any criminal proceeding at the moment the trial jury is selected and sworn to try the case."). Under Mississippi Rule of Criminal Procedure 17.9:

> If, during the course of trial, the [defense] attempts to introduce evidence which has not been timely disclosed to the [prosecution] as required by these Rules and the [prosecution] objects to the introduction for that reason, the court shall . . . [g]rant the [prosecution] a reasonable opportunity to interview

investigate the matter further or determine whether there was impeachable evidence with respect to Arrington's own testimony.[7]

¶44. We recognize that under Mississippi Rule of Criminal Procedure 17.9, the State would ordinarily be required to request a continuance "before . . . complain[ing] of the admission of previously undisclosed evidence." *De La Beckwith v. State*, 707 So. 2d 547, 574 (¶101) (Miss. 1997).[8] Nevertheless, "a request for a continuance is not a prerequisite to the exclusion of such evidence . . . . [T]he [State's] failure to [request a continuance] does not abrogate the trial court's discretion to exclude such evidence in certain circumstances." *Id.*; *Pelletier*, 207 So. 3d at 1270 (¶32). As the supreme court has explained, "if the omission was willful and motivated by a desire to obtain a tactical advantage that would minimize the effectiveness of cross-examination and the ability to adduce rebuttal evidence, it [is] entirely appropriate to exclude the witness'[s] testimony." *De La Beckwith*, 707 So. 2d at 575 (¶103) (citation and internal quotation marks omitted); *see Morris v. State*, 927 So. 2d 744, 747 (¶9) (Miss. 2006); *Davis*, 243 So. 3d at 236-37 (¶66).

---

the newly discovered witness . . . .

MRCrP 17.9(b)(1). The rule specifies that "the court shall follow the same procedure for violation of discovery by [either the prosecution or] the defense." MRCrP 17.9(b).

[7] The State initially sought to exclude the testimonies of both Arrington and Roberts. Ultimately, however, the defense informed the trial court that it no longer sought to call Roberts as a witness after Arrington testified that Roberts was a schizophrenic who hears voices and had stabbed himself in the pancreas.

[8] In *De La Beckwith*, 707 So. 2d at 573-74 (¶¶99-101), the Mississippi Supreme Court discussed Uniform Criminal Rule of Circuit Court Practice 4.06, which is the predecessor to Uniform Circuit and County Court Rule 9.04, which is the predecessor to the current Mississippi Rule of Criminal Procedure 17.

¶45. As stated, "the record must contain evidence that the defendant committed a discovery violation to obtain a tactical advantage before exclusion becomes the appropriate sanction." *Overton v. State*, 195 So. 3d 715, 718 (¶10) (Miss. 2016). We find that such evidence exists in this case and we therefore affirm the trial court's decision based upon the standard of review we are required to apply: "Upon weighing all relevant factors in the case, *unless there is clear error in judgment as to the sanctions imposed for violation of the discovery rule*, this Court will affirm the imposed sanction." *Pelletier*, 207 So. 3d at 1268 (¶24) (emphasis added). We find no "clear error" here and find that the trial court did not abuse its discretion in excluding Arrington's testimony in this case.

¶46. We find *Morris*, 927 So. 2d at 747 (¶9), instructive. In *Morris*, the defendant asserted that the trial court erred when it excluded the testimony of two defense witnesses that were disclosed by the defense the morning of trial. The supreme court disagreed, finding that the discovery violation was wilful, and exclusion of the evidence was proper, where the defendant gave the State a list of witnesses the morning that the trial began, and "[t]he only reason proffered by [the defendant] for failure to designate [the] witnesses sooner was the police department's failure to find these witnesses and give the names to [the defendant] through discovery." *Id.* As the supreme court held:

> Morris violated the discovery rule by failing to give the State the defense's witness list when the State provided its list to defense counsel. *Defense counsel waited until the weekend prior to the trial, which began on a Monday, to find defense witnesses*. Finally, and most importantly, instead of giving the list of defense witnesses to the State one or two days prior to trial, defense counsel waited until the morning the trial began. *To blame the prosecution or the police department for [defendant's] own failure to investigate and failure to abide by the discovery rules is disingenuous at best. This issue is without*

20

*merit.*

*Id.* (Emphasis added).

¶47.    The same analysis applies here.  As the trial court determined, defense counsel had been appointed as Blakely's counsel six months before trial, and did not seek a continuance for additional discovery at that time, nor did he seek a continuance or file a notice of newly-discovered evidence with respect to Arrington prior to the start of trial, which were two procedural avenues Blakely could have pursued.  Speaking directly to Blakely's counsel, the trial court stated that, instead, "you wait[ed] until the jeopardy is attached to your client." Continuing, the trial court stated, "Give the Court some reason for this—other than the purpose is intentionally done to either require this Court to declare a mistrial or declare that you cannot present this witness . . . in your defense or give you the advantage that the State doesn't have the time to investigate."

¶48.    The only reason given by defense counsel was that he could only present evidence of Arrington when he learned of him—despite the fact that defense counsel admitted that he "was aware that there were allegations that people had been out there . . . on that day, but [that he] didn't have any idea who they [were];" and that two weeks before trial he obtained a copy of the transcript from McFarland's habeas corpus proceeding that Arrington had attended. Defense counsel admitted that it was his client, not himself, that located Arrington. When asked by the trial court what he had done to prepare for trial, defense counsel revealed that he merely relied on the State's discovery and had discussed the case with his client several times.  Although the record reflects that defense counsel had access to his client and

21

the ability to confer with him, we find no evidence in the record that defense counsel independently investigated the facts that surrounded the charges in the indictment. As the supreme court held in *Morris* under similar circumstances, *Morris*, 927 So. 2d at 747 (¶9), we find that this issue is without merit.

¶49. Ignoring these factors and the *Morris v. State* decision, the dissent asserts that Arrington should not have been excluded in this case. The dissent relies on *Overton v. State* for this proposition, a case in which the supreme court recognized that "[t]he fact that evidence was recently discovered, by itself, is insufficient proof that a discovery violation was willful and motivated by a desire to obtain a tactical advantage." 195 So. 3d at 718 (¶10) (internal quotations omitted). We agree with that principle. As we have addressed above, however—and unlike the circumstances in *Overton*—the late discovery of Arrington in this case was *not* the only evidence before the trial court when it determined that defense counsel's discovery violation warranted exclusion.

¶50. Specifically, in *Overton*, 195 So. 3d at 718 (¶11), the supreme court found that "[t]he record contains no evidence that either the defendant or defense counsel withheld the witnesses' identities to gain a tactical advantage. . . [and] the circuit judge made no such finding. *Instead, he ruled that defense counsel had done nothing wrong*, but the witnesses would be excluded because they were 'material.'" (Emphasis added). Continuing, the supreme court said, "First, the trial judge never asserted that Overton or his counsel had committed any willful discovery violation." *Id.* (¶12). On the contrary, "[t]he trial judge stated that he 'did not intend in any way to impute anything improper about counsel handling

this matter' and that the late disclosure of the witnesses 'was a matter where the family, I think, came up with these witnesses right toward the end there, and so it's a situation like that.'" *Id.* at 718-19 (¶12). The supreme court concluded by observing, "If, as the trial judge assumed, the family (not the defendant) 'came up' with the witnesses late, no reasonable inference is to be drawn that Overton or his counsel willfully violated the discovery rules." *Id.* at 719 (¶13).

¶51. None of these circumstances are present in Blakely's case. Rather, the trial court admonished defense counsel for waiting "until . . . jeopardy is attached to your client," before confirming that counsel intended to call Arrington at trial; and the record is plain that the trial court was not satisfied with the excuse defense counsel provided—that he just learned of Arrington the night before. In that regard, the trial court further admonished counsel for failing to pursue other procedural options available to him, such as seeking a continuance when he was appointed as Blakely's counsel six months before trial, or filing a notice of newly discovered evidence with respect to Arrington before trial started. The trial court also found fault with defense counsel's failure to independently investigate the facts, instead relying on the discovery provided by the State and a few discussions with his client. In short, we cannot agree with the dissent's assertions on this point. We find that *Overton* is wholly distinguishable on its facts and inapplicable here.

## II. Defective Indictment

¶52. Blakely asserts that Count I of the indictment was fatally defective because it identified the controlled substance at issue, cocaine, as a Schedule I controlled substance

23

when it is actually a Schedule II controlled substance. We "review[] de novo the question of whether an indictment is fatally defective." *Townsend v. State*, 188 So. 3d 616, 619 (¶10) (Miss. Ct. App. 2016). Our review of the record reveals that Blakely did not object to the indictment at trial. As we will explain below, the incorrect classification of cocaine in the indictment was one of form, not of substance, and thus Blakely, by failing to object at trial, waived this issue for appellate review. *See Jerninghan v. State*, 910 So. 2d 748, 750 (¶4) (Miss. Ct. App. 2005) ("When the formal defect is curable by amendment the failure to demur to the indictment in accordance with our statute will waive the issue from consideration on appeal.") (citations and internal quotation marks omitted). Procedural bar notwithstanding, we also address the merits of this assignment of error, and find it without merit for the reasons addressed below.

¶53. Mississippi Rule of Criminal Procedure 14.1 provides that "[t]he indictment upon which the defendant is to be tried shall be a plain, concise and definite written statement of the essential facts and elements constituting the offense charged and shall fully notify the defendant of the nature and cause of the accusation." As the supreme court has held:

> An indictment must contain (1) the essential elements of the offense charged, (2) sufficient facts to fairly inform the defendant of the charge against which he must defend, and (3) sufficient facts to enable him to plead double jeopardy in the event of a future prosecution for the same offense.

*Gilmer v. State*, 955 So. 2d 829, 836-37 (¶24) (Miss. 2007).

¶54. The indictment in this case provided that Blakely and McFarland "as part of a common plan or scheme or as part of the same transaction or occurrence in [Clarke] County . . . on or about [August 8, 2017,] . . . did wilfully, unlawfully, and feloniously and knowingly

24

traffic 118.379 grams of Cocaine, a Schedule I controlled substance, in violation of [Mississippi Code Annotated] [s]ection 41-29-139(f)(c) . . . ."

¶55. The trafficking statute, section 41-29-139(f), provides:

> Trafficking. (1) Any person trafficking in controlled substances shall be guilty of a felony and, upon conviction, shall be imprisoned for a term of not less than ten (10) years nor more than forty (40) years . . . . The ten-year mandatory sentence shall not be reduced or suspended. The person shall not be eligible for probation or parole, the provisions of Sections 41-29-149, 47-5-139, 47-7-3 and 47-7-33, to the contrary notwithstanding.
>
> . . . .
>
>        (2) "Trafficking in controlled substances" as used herein means:
>
> . . . .
>
>               (C) A violation of subsection (c) of this section involving thirty (30) or more grams . . . of a *Schedule I or II controlled substance* except marijuana and synthetic cannabinoids . . . .

(Emphasis added). "[S]ubsection c" referenced in Section 41-29-139(f)(2)(C) provides that "[i]t is unlawful for any person knowingly or intentionally to possess any controlled substance" that is not obtained by a valid prescription, and specifies that the penalties for any violation "with respect to a controlled substance classified in *Schedules I, II*, III, IV or V . . . shall be based on . . . the weight of the controlled substance." (Emphasis added).

¶56. Upon review of the plain language of the indictment and the applicable charging statute, we find that the reference in the indictment to cocaine as a Schedule I, rather than a Schedule II, controlled substance did not render the indictment fatally defective. This is so because the nature of the charge and its penalty in this case is governed by the weight of the cocaine involved, not whether it is identified as a Schedule I or II controlled substance. In

25

particular, a violation of the trafficking statute occurs in instances "involving thirty . . . or more grams . . . of a Schedule I *or* II controlled substance," Miss. Code Ann. § 41-29-139(f)(2)(C) (emphasis added); and the penalty imposed is based upon "the weight of the controlled substance," Miss. Code Ann. § 41-29-139(c), not by its classification. As such, the indictment was not fatally defective. *Cf. Jones v. State*, 215 So. 3d 508, 512 (¶12) (Miss. Ct. App. 2017) (indictment lacking weight of cocaine not defective where penalty was the same regardless of the precise quantity sold); *Fair v. State*, 93 So. 3d 56, 58-59 (¶¶7-8) (Miss. Ct. App. 2012); *Smith v. State*, 973 So. 2d 1003, 1006-07 (¶10) (Miss. Ct. App. 2007).

¶57. Applicable case precedent establishes that "so long as from a fair reading of the indictment, taken as a whole, the nature and cause of the charge against the accused are clear, the indictment is legally sufficient." *Harrison v. State*, 722 So. 2d 681, 687 (¶22) (Miss. 1998). Further, "the purpose of the indictment is to provide the accused reasonable notice of the charges against him so that he may prepare an adequate defense." *Ludwig v. State*, 147 So. 3d 360, 362 (¶6) (Miss. Ct. App. 2014). In this case, the indictment cited the charging statute, named the substance involved (cocaine), and included the weight of the cocaine (118.379 grams)—Blakely was plainly notified of the nature of the charge against him and the potential penalties he faced. We find no merit in this assignment of error.[9]

_____

[9] Blakely also appears to assert that his "conviction and sentence in this matter should be overturned" because the jury instruction on this charge also contained the same misidentification of cocaine as a Schedule I, rather than as a Schedule II, controlled substance. Blakely offers no further argument or explanation for this contention in his brief, nor does he cite any authority to support this contention. We therefore decline to address it. M.R.A.P. 28(a)(7) (The appellant's brief must "contain the contentions of appellant with respect to the issues presented, and the reasons for those contentions, with citations to the authorities, statutes, and parts of the record relied on."); *In re Estate of Forrest*, 165 So. 3d

## III.    The Constitutionality of Section 41-29-139(f)(2)(C), As Applied

¶58.    Blakely asserts that his rights to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments of the United States Constitution, and under Article 3, Section 28 of the Mississippi Constitution (prohibiting cruel or unusual punishment), were violated by what he claims was an unconstitutional application of the trafficking sentencing guidelines under section 41-29-139(f)(2)(C), set forth above.  According to Blakely, these rights were violated because he was indicted and sentenced under the trafficking provision of the Uniform Controlled Substances Law (section 41-29-139(f)(2)(C)) and therefore received a harsher penalty than if he had been indicted and sentenced under the "simple possession" provision of the Uniform Controlled Substances Law (section 41-29-139(c)).

¶59.    Blakely does not cite any authority to support this contention and thus he is procedurally barred from asserting it.  *In re Estate of Forrest*, 165 So. 3d at 550 (¶7).

¶60.    Procedural bar notwithstanding, we also find no merit in Blakely's assertions. Addressing an argument similar to Blakely's in *Stromas v. State*, 618 So. 2d 116, 123 (Miss. 1993), the supreme court upheld the defendant's enhanced sentence as a habitual offender, observing that "[d]rug offenses are very serious and the public has expressed grave concern with the drug problem. The legislature has responded in kind with stiff penalties for drug offenders.  It is the legislature's prerogative and not this Court's to set the length of sentences."  *See also Hathorne v. State*, 267 So. 3d 798, 801 (¶10) (Miss. Ct. App. 2018),

---

548, 550 (¶7) (Miss. Ct. App. 2015) ("It is well settled under Mississippi caselaw that failure to cite any authority is a procedural bar, and a reviewing court is under no obligation to consider the assignment." (citation and internal quotation mark omitted)).

27

*cert. denied*, 267 So. 3d 281 (Miss. 2019).

¶61. In this regard, "in the context of our habitual statutes, as well as in sentencing other offenders," *Stromas*, 618 So. at 123, the supreme court "has recognized the broad authority of the legislature and trial court[s] in this area and ha[s] repeatedly held that where a sentence is within the prescribed statutory limits, it will generally be upheld and not regarded as cruel and unusual." *Id.* at 123-24. This Court follows the same principle. *See, e.g.*, *Passman v. State*, 937 So. 2d 17, 24 (¶23) (Miss. Ct. App. 2006); *Maldonado v. State*, 796 So. 2d 247, 261-62 (¶¶44-47) (Miss. Ct. App. 2001).

¶62. In this case, Blakely was sentenced to serve twenty years, which is well within the statutory guidelines under section 41-29-139(f) that allows for "imprison[ment] for a term of not less than ten . . . years nor more than forty. . . years." Accordingly, under the precedent discussed above, we find Blakely's assignment of error on this point without merit.

¶63. **AFFIRMED.**

**BARNES, C.J., GREENLEE, LAWRENCE AND C. WILSON, JJ., CONCUR. J. WILSON, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. WESTBROOKS, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION. McCARTY, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY WESTBROOKS AND McDONALD, JJ. McDONALD, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.**

**McCARTY, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶64. Because the defense witness should have been allowed to testify and excluding him violated the constitutional rights of the defendant, I respectfully dissent in part. Absent proof of a deliberate scheme to gain a substantial tactical advantage over the State, the defense

should not have been excluded.

¶65.    We have clear precedent on this point, which is scarcely four years old, from our State's highest court.  In that case—which is directly on point to this one—"the day before trial, the defense filed a witness list, indicating its intent to call" two witnesses who were not previously disclosed.  *Overton v. State*, 195 So. 3d 715, 717 (¶5) (Miss. 2016).  Just as in this case, "[d]uring voir dire the next morning, the State objected that it had been blindsided by these witnesses."  *Id*.  And just as in this case, the trial court excluded the witnesses.  *Id*.

¶66.    Our Court of Appeals determined that the exclusion was not prejudicial because there was enough evidence to prove that the defendant committed the crime.  *Overton v. State*, 195 So. 3d 797, 800 (¶14) (Miss. Ct. App. 2015), *rev'd*, 195 So. 3d 715 (Miss. 2016).  The Supreme Court granted writ of certiorari and peered more deeply into the issue.  *Overton*, 195 So. 3d at 717 (¶8).

¶67.    The Supreme Court started with what is really at stake when a defense witness is excluded in a criminal trial: "With regard to discovery sanctions . . . the court cannot disregard the fundamental character of the defendant's right to offer the testimony of witnesses in his favor."  *Id*. at 718 (¶9) (internal quotation marks and alteration omitted).  Critically, "the general rule is that evidence *must not be excluded*."  *Id*. (emphasis added) (alteration omitted).

¶68.    Let us stop here to address that very important point.  Before we exclude a witness for the defense in a criminal case, we must remember that the general rule is to *not* do that.  As the Supreme Court further explained, this is because "exclusion of evidence is a radical

sanction that ought be reserved for cases in which the defendant participates *significantly* in some *deliberate, cynical scheme to gain a substantial tactical advantage*." *Id*. (emphasis added).

¶69.   The facts in this case do not come within a country mile of a "deliberate, cynical scheme to gain a substantial tactical advantage." *Id*.  First of all, it is uncontested that Blakely's counsel was not the same lawyer present during the prior habeas matter that had been held months before.  Therefore, he obviously had no first-hand knowledge of the witness at issue.

¶70.   Secondly, the lawyer—*an officer of the court*—stood in front of the trial court and said that he had only learned of the witness *the night before the trial*.

¶71.   On this point he was steadfast:

> BY [DEFENSE COUNSEL]:  Your Honor, **I was not aware of this witness until last night**–I spoke to him on the phone–and disclosed it to the State today.  Prior to that, I did not know [about him].
>
> . . . .
>
> BY THE COURT: And when did this witness become known to you?
>
> BY [DEFENSE COUNSEL]: **Last night**. The police report does indicate that there were persons on the scene, but it doesn't identify anybody.

(Emphasis added).

¶72.   After the proffer of the witness's testimony, the trial court told defense counsel that "[i]t [was] apparent that [he] violated . . . the discovery rules" and asked if there "[was] any excusable neglect" to explain why the witness was late disclosed.  Defense counsel again stated that the witness was disclosed late because he "never located him **nor knew of him**

30

**until last night** . . . ." (Emphasis added). He further reiterated his point by stating "[a]ll of this is new to me."

¶73. Given these uncontested facts, there was no "deliberate, cynical scheme to gain a substantial tactical advantage." *Id*. Instead, what these facts show is a lawyer working hard the day before trial to prepare for a case. Absent a tactical scheme, and given what *Overton* mandates, the exclusion was legally wrong and must be reversed.

¶74. *Overton* does not stop with just giving us a general view. It speaks directly and specifically to the exact issue in this case. "The fact that evidence was recently discovered, by itself, is insufficient proof that a discovery violation was willful and motivated by a desire to obtain a tactical advantage." *Overton*, 195 So. 3d at 718 (¶10) (internal quotation marks omitted). While the evidence in this case was certainly recently discovered, the fact that its discovery was recent is not enough to warrant exclusion of the evidence. For the court proceeded to "reject[] a posture in which we assume that recently discovered evidence is part of some scheme to defraud justice *and require the defendant to prove otherwise*." *Id*. (internal quotation marks omitted) (emphasis added).

¶75. The Supreme Court concluded that "the record must contain evidence that the defendant committed a discovery violation to obtain a tactical advantage before exclusion becomes the appropriate sanction." *Id*.

¶76. The Supreme Court's decision in *Overton* completely controls this case both generally and specifically. In contrast to the clear holding in *Overton*, the majority in this case presumes that defense counsel sandbagged the State on the eve of trial and so we should

31

affirm the exclusion of the witness. That inverts the standard, as *Overton* prohibits, and requires Blakely "to prove otherwise" that he wasn't trying to defraud justice. *Id*.

¶77. The majority also presumes bad faith on the part of defense counsel, which the record simply does not support. Because lawyers are bound by oaths and rules of professional conduct that forbid misleading a tribunal, we must presume that what they tell us is true. Peering through this lens, as we must and should according to the Supreme Court's decision in *Overton*, this case becomes much easier. The ultimate disclosure of the witness was clearly not wilful, as the attorney stated repeatedly to the trial court that he had just learned of the person's existence. His explanation is enough. It should be taken as true and certainly thwarts the majority's presumption that the lawyer schemed to defraud justice.

¶78. If we needed proof beyond the word of the defense counsel, although we should not need such proof, there is indeed another reason we should believe the lawyer. He had actively pursued a theory that the State had committed a *Brady* violation by not developing the lead the witness presented, and then by failing to disclose the witness's identity. While I do not believe that this was a *Brady* violation, this zealous argument further underscores why we are making the wrong decision.

¶79. Our Constitution guarantees that "the accused shall have a right to be heard by himself or counsel, or both," and "to have compulsory process for obtaining witnesses in his favor," among other valuable safeguards. Miss. Const. Art. 3, § 26. This guarantee of a fair trial is thwarted when a defendant cannot put on witnesses to testify on their behalf. This is why *Overton* was cautious to say that although some witnesses can be excluded, we should very

32

rarely allow this. In fact, exclusion of witnesses should only be allowed when there is proof of a "deliberate, cynical scheme to gain a substantial tactical advantage." *Overton*, 195 So. 3d at 717 (¶9). Because there was no such proof in this case, we must reverse to allow Blakely a new trial.

¶80. While I agree with the majority that the indictment was not defective and that the Legislature has set the penalty for the convictions in this case, we must not disregard binding Supreme Court precedent by affirming the exclusion of the late-disclosed defense witness. On that point, I must respectfully dissent.

**WESTBROOKS AND McDONALD, JJ, JOIN THIS OPINION.**